IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


SHAWN B. McCULLERS           :      CIVIL ACTION
                             :
        v.                   :
                             :
MICHAEL CHERTOFF, Secretary, :
Department of Homeland       :
Security                     :      NO. 07-4187


MEMORANDUM

McLaughlin, J.                            January 11, 2010


        Shawn B. McCullers, an African American, brought pro se

two counts of employment discrimination against the Federal Air

Marshal Service ("FAMS"), alleging that the defendant treated him

unfairly and terminated him because of his race.  The Court

dismissed the plaintiff's claim under 42 U.S.C. § 1981 upon

consideration of the defendant's motion to dismiss.  The

defendant now moves for summary judgment on the plaintiff's

remaining claim of discrimination and retaliation under Title

VII, 42 U.S.C. § 2000e.[1]

--------------------------------------------------

        [1] On January 1, 2009, after the close of discovery, the
plaintiff sought leave to amend his complaint to include, among
other things, a claim of disability discrimination.  The Court
denied the motion in a memorandum and order on May 1, 2009,
finding an amendment to add a disability claim to be unduly
dilatory.  First, although the plaintiff argued that newly
discovered information supported a disability claim, the
allegations in the proposed amended complaint were virtually
identical to those stated in the original complaint.  Second, the
plaintiff was aware that he could have filed a disability
discrimination claim when he originally filed this federal action
because he alleged a disability claim in his 2005 EEO complaint.
Third, allowing the plaintiff leave to add a disability

I.  The Summary Judgment Record[2]

The plaintiff is an African American male who was employed by the Department of Homeland Security as a Federal Air Marshal ("FAM") in the Philadelphia Field Office.  He claims that certain alleged actions taken by the defendant, including the defendant's failure to process the plaintiff's medical claims, designation of the plaintiff as Absent Without Leave ("AWOL"), and eventual termination of the plaintiff, were the result of racial discrimination and retaliation.

The defendant asserts that the plaintiff, who suffers from a medical condition, was terminated because he could not perform the essential functions of his position.  It further argues that the actions taken against the plaintiff do not constitute racial discrimination or retaliation.

A.  The Plaintiff's Employment with the Defendant

The plaintiff began his employment as a FAM on July 14, 2002.  Upon his employment, the plaintiff signed a document entitled "Conditions of Employment for Federal Air Marshals," which detailed that a FAM may be removed from employment if he or

---

discrimination claim would have prejudiced the defendant by either forcing the defendant to proceed without discovery related to the plaintiff's new claim or forcing the Court to reopen discovery.

[2] On a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2

she, among other conditions, failed to maintain medical standards or could not perform an essential function of his or her position.  Ninety percent of the plaintiff's job as a FAM required flying.  Conditions of Employment, Ex. B to Def.'s M; see Deposition of Shawn B. McCullers 54:7-22, 273:8-19 ("McCullers Dep."), Ex. C to Def.'s M.[3]

The plaintiff's immediate supervisor was Donald Anderson, Assistant to the Special Agent in Charge.  Mr. Anderson evaluated the plaintiff's work performance on September 29, 2003, and on April 12, 2004, as part of a mid-year review process.  Both times he noted that the plaintiff "met or exceeded the standard for satisfactory performance."  Performance Agreements, May 29, 2002, and April 12, 2004, Exs. D and E.

B.    The Plaintiff's Medical Injuries

When an employee sustains a traumatic injury in the performance of his duties as an employee of the United States, he may seek compensation benefits and a continuation of regular pay for up to forty-five days without use of annual or sick leave.  The employee must complete a Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation, also known as a CA-1, within thirty days after the injury.  The employee must also have his medical provider complete an

_____

[3] All exhibit references reflect those attached to the defendant's motion for summary judgment, unless otherwise noted.

Attending Physician's Report.  When an employee develops an occupational disease, he completes an Occupational Disease Form, also known as a CA-2.  An occupational disease is one that develops over time, and an employee reporting an occupational disease cannot receive continuation of pay.  Both forms are submitted to the Office of Workers' Compensation ("OWCP") of the Department of Labor ("DOL"), an agency separate from the defendant.  <u>See</u> Aff. of David Wichterman, FAMS Workers' Compensation Program Manager ("Wichterman Aff.") 3-4, Ex. M; McCullers Dep. 137:5-140:8; CA-1 Form, Ex. F; Attending Physician's Report, Ex. G; Def.'s M. 5; Def.'s Statement of Material Facts ¶ 48.

On April 13, 2004, the plaintiff injured his left ankle during a training exercise.  He completed a CA-1 and requested forty-five days of continuation of pay.  OWCP accepted his claim, and he received standard workers' compensation benefits, which amount to seventy-five percent of the worker's salary, tax free. McCullers Dep. 137:5-138:20, 245:14-146:14; CA-1, Ex. F.

The plaintiff returned to work in June 2004, but on August 9, 2004, he noticed swelling in his left leg and experienced pain in his ankle.  He requested an additional forty-five days of continuation of pay, but Karen Jost, Philadelphia Field Office Administrator Officer, told him that he had already received the maximum benefits for his injury.  Nevertheless, the

plaintiff completed a CA-1 on September 28, 2004. OWCP denied the plaintiff's application because the form was submitted over thirty days after the date of injury. McCullers Dep. 184:7-186:7; Email from Karen L. Jost to Shawn B. McCullers, Sept. 2, 2004, Ex. H;[4] CA-1 Form, Ex. I; McCullers Dep. 191:1-193:14.

Still experiencing pain in his leg, the plaintiff sought medical attention in early October. On October 8, 2004, Dr. Wang diagnosed the plaintiff with deep vein thrombosis ("DVT"). Dr. Wang completed paperwork that stated the plaintiff's diagnosis and his ability to return to regular work that same day, except that it prohibited him from flying for one month. CA-20 and CA-17, Exs. J and K.

On November 26, 2004, Dr. Holleran completed paperwork noting that the plaintiff was "okay for light duty [and] workouts" and can "do desk work, but no physical confrontations." On December 8, 2004, Dr. Holleran completed more paperwork diagnosing the plaintiff with DVT and stating that the plaintiff can return to light work. CA-17, Ex. W; Decl. of Donald Anderson ("Anderson Decl.") 22, Ex. V.

It is undisputed that the plaintiff did not return to work on October 8, 2004, or at any time prior to his non-disciplinary removal on January 30, 2006. It is also undisputed

---

[4] All references to email correspondence can be found in Exhibit H of the defendant's motion for summary judgment.

that the plaintiff is unable to fly because of his medical condition. Further, it is undisputed that the plaintiff did not submit the medical forms detailing his prognosis, diagnosis, and estimated return date until December 9, 2004. Notice of Removal, Exhibit NN; Anderson Decl. 19-21; McCullers Dep. 203:8-15, 210:14-23.

   C.   The Plaintiff's AWOL Status

   Mr. Anderson contacted the plaintiff on November 1, and again on November 23, 2004, to inform the plaintiff that he would run out of his annual and sick leave by November 29 and must submit medical documentation of his diagnosis, prognosis, and estimated return date to be placed on Leave Without Pay ("LWOP") status. Because the plaintiff did not turn in his medical documentation before November 29, he was marked AWOL on November 30, 2004. Anderson Decl. 9; Email from Donald E. Anderson to Shawn B. McCullers, Nov. 23, 2004; Mem. from Louw-Shiang Liu to Shawn B. McCullers, Nov. 30, 2004, Ex. P.

   On December 3, 2004, the plaintiff stated that he was in the process of providing the required medical information, and he requested a light duty assignment. Mr. Anderson contacted the plaintiff on December 6, 2004, and reiterated that the plaintiff would remain on AWOL status until he either returned to work or provided the necessary medical documentation and requested LWOP status. The plaintiff could return to work in a "light duty"

position if he provided medical documentation.  On December 9,
2004, the plaintiff submitted his diagnosis, prognosis, and
estimated return date to Mr. Anderson.  The plaintiff also
requested a light duty assignment, advanced sick leave, and LWOP
status.  Mem. from Shawn B. McCullers to Louw-Shiang Liu, Dec. 3,
9, and 22, 2004, Exs. Q, T, and U; Anderson Decl. 14-15, 19-21.

As a result of the plaintiff's medical documentation,
Mr. Anderson attempted to contact the plaintiff thirteen times
on Friday, December 10, 2004, regarding a temporary modified
assignment that would begin on Monday, December 13.  On December
13, the plaintiff did not report to work for the light duty
assignment, and he contacted Mr. Anderson requesting a formal
assignment description.  The plaintiff received an official light
duty assignment on December 23, 2004, and had fourteen days to
accept the offer.  After not hearing from the plaintiff, Mr.
Anderson re-sent the assignment by email on December 30, 2004,
and by federal express on January 5, 2005.  The federal express
package was "refused by recipient."  Anderson Decl. 22-24, 26-27;
McCullers Dep. 231:17-232:8; Email from Linda S. Harrison to
Richard X. Farwell, Dec. 22, 2004; Modified Assignment, Ex. X;
Email from Donald E. Anderson to Shawn B. McCullers, Dec. 23 and
30, 2004; Federal Express Receipt, Ex. Z.[5]

---

[5] The plaintiff received another light duty assignment offer
on June 8, 2005, which required the plaintiff to report to the
Philadelphia Field Office on June 27, 2005.  The plaintiff did

On January 4, 2005, as a result of the plaintiff's AWOL status, the defendant sent three special agents to retrieve the plaintiff's credentials and equipment. Mr. Anderson also restricted the plaintiff's computer access. Mr. Anderson sent an email to various FAMS officers notifying them of these actions. Anderson Decl. 39-40.

### D.   The Plaintiff's Government-Issued Credit Card

Upon his employment, the plaintiff received a government-issued credit card to be used only "when traveling in Federal Air Marshal Mission Status." On December 13, 2004, after being informed that the plaintiff's government travel card account was delinquent and suggested personal use, Mr. Anderson told the plaintiff that his card limit would be reduced to $1 and disciplinary action may result. The plaintiff made a partial past-due payment on December 16, 2004, but his account remained delinquent as of January 14, 2005. Use of Government Issued Credit Card, Ex. DD; Anderson Decl. 25-27; Email from Karen L. Jost to Donald E. Anderson, Jan. 14, 2005.

### E.   Proposed Termination of the Plaintiff

On December 15, 2004, Mr. Anderson recommended termination of the plaintiff because of the plaintiff's credit

---

not report to this assignment. Letter from Robert E. Clark to Shawn McCullers, Ex. BB; McCullers Dep. 266:6-18.

card abuse, AWOL status, lack of professionalism, and insubordination. The defendant recommended this termination to human resources on January 7, 2005, and sent a letter to the plaintiff to this effect on February 8, 2005. The plaintiff objected to the proposed termination because he was being compensated under OWCP regulations and the credit misuse was unintentional. On June 8, 2005, Mr. Liu issued a decision as to the proposed termination. He did not sustain the AWOL claim, but he did sustain the credit card claim and issued a suspension without pay for fourteen calendar days. Anderson Decl. 31, 33; Letter from Bob E. Clark, Assistant Special Agent in Charge, to Shawn B. McCullers, Feb. 8, 2005, Ex. EE; Letter from Louw-Shiang Liu to Shawn B. McCullers, June 8, 2005, Ex. FF.

F.    The Plaintiff's Workers' Compensation and Leave Buy Back Forms

On October 12, 2004, the plaintiff submitted a CA-1 for his DVT and requested forty-five days of continuation of pay. Mr. Anderson sent the plaintiff's CA-1 form for processing, but he informed the plaintiff that because DVT is an occupational disease, it required a CA-2. In December 2004, pursuant to the advice from a case adjudicator from OWCP, the plaintiff changed his CA-1 claim to a CA-2 claim. On January 5, 2005, OWCP approved the plaintiff's CA-2 claim. CA-1, Ex. L; See Wichterman Aff. 3; Aff. of Shawn B. McCullers ("McCullers Aff.") 11, Ex. N.

In January 2005, the plaintiff submitted to FAMS one of the two required forms to request workers' compensation benefits and the ability to "buy back" his previously used leave. Upon request from an OWCP case worker, Mr. Anderson emailed the plaintiff's medical records to the case worker and completed the FAMS portion of the form the plaintiff submitted. Mr. Anderson asked that the plaintiff's request to buy back leave be denied for the period between December 10, 2004, and January 7, 2005, because the plaintiff failed to return to work, contrary to his physicians' recommendations. OWCP denied the plaintiff's request for this time period. Claim for Compensation, Ex. CC; Letter from William Staarman, District Director, to Shawn B. McCullers, Mar. 31, 2005, Ex. O; Anderson Decl. 42, 45-46; Email from Donald E. Anderson to Gerald Rose, Jan. 7, 2005.

On March 31, 2005, the OWCP informed the plaintiff that it had made an administrative error when processing the plaintiff's forms. OWCP also informed the plaintiff that he would receive workers compensation within two weeks. On April 20, 2005, the plaintiff began to receive workers' compensation. Ex. O 3-4; Ex. EEO Final Decision 5, Ex. II.

G. The Plaintiff's EEO Activity

On February 4, 2005, Mr. Anderson received a message from an EEO counselor regarding the plaintiff, and Mr. Anderson and the EEO counselor spoke on February 8, 2005, about the

plaintiff's claims of racial and retaliatory discrimination.
Anderson Decl. 46-47.

On March 11, 2005, the plaintiff filed an EEO complaint listing sixteen charges of race, disability and reprisal discrimination because of his February 8, 2005 notice of proposed removal.[6]  The EEO dismissed the plaintiff's claim regarding the proposed removal because the removal was not an adverse action. It found no evidence of discrimination based on the plaintiff's other charges.  On June 29, 2005, the plaintiff filed another EEO complaint alleging race, disability, and reprisal discrimination based on his AWOL status and his fourteen-day suspension.  EEO Complaints, Exs. HH, JJ; Ex. II.

H.   The Plaintiff's Travel Voucher

The plaintiff attempted to request a travel reimbursement on August 10, 2005, and created the voucher in September 2005, although he was informed the previous September that this voucher was due by October 15, 2004.  His voucher did not include his required electronic signature, and the plaintiff was still locked out of the computer system, so the voucher was not processed.  On December 7, 2005, the plaintiff inquired about

---

[6] The plaintiff also instituted a claim for the discipline he received due to a dress code violation.  The EEO dismissed the claim as untimely.  The plaintiff does not allege a claim for his dress code discipline in his federal complaint.  Complaint of Discrimination, Ex. HH; Ex. II; Tr. 2:23-3:17 (Mar. 6, 2008).

his voucher.  Ms. Jost manually processed the voucher for the plaintiff and transferred the reimbursement to the plaintiff's account on December 29, 2005.  Aff. of Karen Jost, Ex. KK.

I.   The Plaintiff's Removal

On August 1, 2005, Special Agent Robert E. Clark informed the plaintiff of his proposed nondisciplinary removal because he was unable to perform the essential functions of his position as a FAM due to his medical condition dating from October 5, 2004.  On January 23, 2006, Mr. Liu informed the plaintiff that he had decided to issue the nondisciplinary removal because the plaintiff's medical condition prevented him from performing the essential functions of his position.  The removal became effective January 30, 2006.  Letter from Robert E. Clark to Shawn B. McCullers, Aug. 1, 2005, Ex. MM; Letter from Louw-Shiang Liu to Shawn B. McCullers, Jan. 23, 2006, Ex. NN.

II. Analysis

The plaintiff asserts a claim of race discrimination and retaliation[7] under Title VII for the defendant's: (1) discipline of the plaintiff, (2) interference with and opposition to the processing of the plaintiff's claims for workers'

---

[7] In his opposition brief, the plaintiff additionally argues that he has been subject to disability discrimination, race discrimination under a theory of disparate impact, and a constructive discharge.  The Court addresses these arguments below.

compensation, (3) failure to give the plaintiff in-grade salary increases, (4) placement of the plaintiff on AWOL status, (5) refusal to provide an appropriate light duty position to the plaintiff, (6) denial to the plaintiff of the right to participate in various agency-wide programs, and (7) termination of the plaintiff. Compl. ¶ 64.

The defendant moves for summary judgment, arguing that the plaintiff cannot establish a prima facie case of discrimination because: (1) the plaintiff, who suffers from DVT, is not qualified for his position; (2) many of the plaintiff's claims do not amount to adverse employment actions; and (3) the plaintiff has not identified similarly situated non-African American employees who were treated differently. It further argues that the plaintiff's retaliation claim fails because the plaintiff has not established a causal connection between the defendant's alleged adverse actions and the plaintiff's protected activity. Further, even if the plaintiff could make out a prima facie case of race discrimination or retaliation, the plaintiff does not rebut the defendant's legitimate, non-discriminatory reasons for its employment decisions.[8]

---

[8] The defendant includes arguments to allegations not included in the federal complaint, such as the defendant's alleged failure to provide the plaintiff with his personnel file and denial of the plaintiff's tuition reimbursement. Because the plaintiff does not allege these actions in his complaint, the Court does not address them.

A party moving for summary judgment must show that there is no genuine issue of material fact and that judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(c).  A plaintiff's allegations and denials, unsupported by facts of record, do not create an issue of material fact sufficient to defeat summary judgment.  See Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Although pro se filings are entitled to liberal construction, the plaintiff must still set forth facts sufficient to survive summary judgment.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Zilch v. Lucht, 981 F.2d 694, 694-96 (3d Cir. 1992).

A.  Race Discrimination

The Supreme Court's decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), controls the plaintiff's discrimination claim.  Under the McDonnell Douglas framework, a plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination: (1) he is a member of a protected class; (2) he was qualified for the position he held or sought; (3) he was subject to an adverse employment action; and (4) similarly situated members of other racial classes were treated more favorably, or that other circumstances exist that give rise to an inference of unlawful discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-12 (3d Cir. 1999).

If the plaintiff establishes a prima facie case of

discrimination, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant can do so, then the burden shifts back to the plaintiff to demonstrate that the defendant's articulated reason is a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802-05.

### 1. The Defendant's Discipline of the Plaintiff

The plaintiff alleges that the defendant discriminated against him by disciplining him more frequently and severely than white employees. The factual allegations that relate to this claim include: (1) the fourteen-day suspension for the alleged credit card misuse, (2) the defendant's retrieval of the plaintiff's equipment and credentials,[9] and (3) the defendant's recommended discharge of the plaintiff.

The plaintiff has failed to satisfy a prima facie case of discrimination for this claim because the plaintiff does not establish circumstances that give rise to an inference of unlawful discrimination or identify a similarly situated employee who was treated differently.[10] In order to identify a similarly

---

[9] The plaintiff argues that his loss of equipment and credentials amounts to a constructive termination. The plaintiff was not constructively discharged, however, because he did not resign from his position nor allege that he was forced to resign. Pl.'s Opp. 11; State Police v. Suders, 542 U.S. 129, 141 (2004).

[10] The plaintiff argues that he does not need to demonstrate that the defendant treated similarly situated employees

15

situated employee, the plaintiff must demonstrate that the employee and the plaintiff shared all relevant aspects of employment.  See e.g., Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003); Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002).  In addition to job function and seniority level, the Court must examine "other factors relevant to the particular workplace."  Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004).

The plaintiff identifies two white FAMs, K.D. and J.T.,[11] who misused government credit cards and were disciplined less severely than the plaintiff, but the record does not demonstrate that these FAMS were similarly situated to the plaintiff.  There is no evidence of the extent of K.D. and J.T.'s credit card abuse, the actual discipline they endured, or whether Mr. Anderson, the plaintiff's supervisor, supervised K.D. and

---

differently because disparate impact claims do not require proof of a discriminatory motive.  Hampton v. Borough of Tinton Falls Police Dept., 98 F.3d 107, 112 (3d Cir. 1996).  Although the plaintiff states correctly the law for disparate impact claims, he does not allege a disparate impact claim in his complaint; he alleges a disparate treatment claim.  Disparate treatment claims require proof of a discriminatory motive or proof that the plaintiff was treated differently than similarly situated employees.  Pivirotto v. Innovative Sys., 191 F.3d 344, 359 (3d Cir. 1999).

[11] All references to FAM employees use the employees' initials in view of the parties' stipulated protective order and confidentiality agreement entered February 29, 2008.

16

J.T.[12]  Further, a white FAM who misused his government-issued
credit card was disciplined to the same extent as the plaintiff.
<u>See</u> McCullers Aff. 5-6; FAMS Disciplined for Gov't Credit Card
Misuse, Exhibit GG.[13]

The plaintiff identifies six employees, D.C., K.D.,
E.T., J.G., T.S., and R.M., who suffered medical injuries and did
not have their credentials or equipment retrieved, but again, the
record does not demonstrate that these employees were similarly
situated to the plaintiff.  All of the identified employees took
light duty positions and were not placed on AWOL status, unlike
the plaintiff.  <u>See</u> McCullers Aff. 4-5.  The plaintiff also does
not identify a similarly situated FAM on AWOL status who abused
his credit card but who did not face recommended discharge.

Further, the plaintiff has not established for any of
his claims facts that give rise to an inference of
discrimination.  <u>See</u> <u>Jones</u>, 198 F.3d at 410-11.  The plaintiff

_____

[12] The plaintiff relies on his affidavit that supported his
EEO complaint to satisfy the similarly situated query.  It is
unclear whether the plaintiff has personal knowledge of K.D. and
J.T.'s situations, and the plaintiff does not support his
statements with documentation.

[13] In his opposition brief, the plaintiff refers to two
exhibits in his motion to amend his complaint that identify other
similarly situated employees who misused government-issued credit
cards but who received lighter punishments.  These exhibits,
however, are insufficient to demonstrate that the employees and
the plaintiff were similarly situated because they do not provide
the race of the employees, the extent of the credit card abuse,
or the supervisor who issued the discipline.  Pl.'s M. to Amend
C. Exs. A and E.

states in his complaint that various FAM supervisors, including
Mr. Anderson, used racial epithets when discussing matters about
the plaintiff while the plaintiff was on leave.  The plaintiff's
brief in opposition, however, does not argue this issue, nor does
it present evidence to suggest an inference of discrimination.
Out of an abundance of caution, the Court requested the
plaintiff's full deposition to determine whether the plaintiff
had personal knowledge of any facts that give rise to an
inference of discrimination.  Although the plaintiff states in
his deposition that another employee heard a supervisor use a
racial epithet, he does not claim that he personally heard the
statement nor provide sufficient context for the statement
itself.  The plaintiff's bare allegations cannot create an
inference of discrimination.  See Haines, 404 U.S. at 520-21.

> 2.  The Defendant's Interference and Opposition to the
>     Processing of the Plaintiff's Claims for Workers'
>     Compensation

The plaintiff alleges that the defendant interfered
with and opposed the processing of the plaintiff's claims for
workers' compensation in a discriminatory fashion.  The factual
allegations that relate to this claim are that: (1) the
plaintiff's medical records for his DVT were not approved until
January 2005; (2) Mr. Anderson requested that the plaintiff's
compensation be denied between the period of December 10, 2004,
and January 7, 2005; and (3) the OWCP improperly processed the

plaintiff's claims.

The plaintiff fails to establish a prima facie case of discrimination. First, the plaintiff does not allege that a similarly situated non-African American employee was treated differently than the plaintiff. See <u>Kosereis</u>, 331 F.3d at 214. Second, the allegations that the plaintiff's medical records were not approved until January and that the OWCP improperly processed the plaintiff's claims are not adverse actions. As stated by the Court of Appeals for the Third Circuit, "[A]n adverse employment action under Title VII is an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004). Any delay or inconvenience in the processing of the plaintiff's claims are not an adverse action because the plaintiff received workers' compensation for his applicable periods, such that his compensation, terms, and employment conditions were unaltered. Third, OWCP's failures are not actionable against the defendant because OWCP is part of a separate agency.

### 3.   In-Grade Salary Increases

The plaintiff asserts discrimination based on the fact that he did not receive in-grade salary increases because Mr. Anderson did not complete an annual performance appraisal of the plaintiff after April 2004. The plaintiff's allegation fails.

The plaintiff did not work as a FAM between April 2004 and June 2004, or at all after sometime in early October 2004. He does not allege that a non-African American similarly situated employee who did not work received a performance appraisal and an in-grade salary increase. See <u>Kosereis</u>, 331 F.3d at 214.

    4.  <u>AWOL Status</u>

The plaintiff fails to establish a prima facie case for his claim that the defendant racially discriminated against him because it placed him on AWOL status although he was on, or should have been on, medical leave. The facts demonstrate that the plaintiff did not submit the required paperwork documenting his diagnosis, prognosis, and estimated recovery time until December 2004. The plaintiff does not allege that a similarly situated FAM who did not provide the required medical paperwork was not placed on AWOL status. See <u>Kosereis</u>, 331 F.3d at 214.

Additionally, the plaintiff's placement on AWOL status does not constitute an adverse action. Although the plaintiff was placed on AWOL status from November 30, 2004, until April 30, 2005, this status was changed on May 25, 2006, to reflect LWOP status. The plaintiff was approved for workers' compensation for the applicable time periods and received his benefits. <u>See</u> <u>Singletary v. Dep't of Corrs.</u>, 423 F.3d 886, 891-92 (8th Cir. 2005) (affirming summary judgment to employer because administrative leave with pay and benefits did not constitute

adverse employment action); <u>McManus v. Williams</u>, 519 F. Supp. 2d 1, 6 (D.D.C. 2007) (finding plaintiff did not suffer adverse employment action when receiving benefits).

The plaintiff argues that he did suffer an adverse employment action because, under workers' compensation, his salary decreased by twenty-five percent. The defendant, however, did not require the plaintiff to apply for workers' compensation, and it offered the defendant two light duty assignments, for which the plaintiff did not appear. As such, the amount of salary under workers' compensation does not constitute an adverse employment action.[14]

5. <u>Light Duty Position</u>

The plaintiff has not met his burden for establishing a prima facie case for his claim that he was not provided a formal light duty position to accommodate his DVT. First, the plaintiff does not allege that a similarly situated non-African American employee received a formal light-duty position job offer. <u>See Kosereis</u>, 331 F.3d at 214. Second, the defendant's initial failure to provide the plaintiff with an official light duty

_____

[14] The plaintiff's argument regarding his workers' compensation salary may apply to the ADA claim he asserts in his opposition brief, to the extent that the plaintiff argues that he was not offered a reasonable accommodation. Because the plaintiff did not bring an ADA claim in his complaint and because the Court denied the plaintiff's motion to amend his complaint to assert an ADA claim, the Court will not evaluate the plaintiff's workers' compensation allegation under an ADA claim analysis.

assignment is not an adverse employment action because it did not alter the plaintiff's compensation, terms, conditions, or privileges of employment.  See Storey, 390 F.3d at 764.  Although the defendant did not provide an official light duty assignment to the plaintiff on October 10, 2004, it did so two weeks later.  It kept this position open for several weeks, and it emailed and sent the assignment via federal express to the plaintiff.

### 6.   Participation in Agency Programs

The plaintiff claims that the defendant discriminated against him by not allowing him to participate in various agency-wide programs.  The allegation that relates to this claim is that the defendant locked the plaintiff out of the computer system, which hindered his ability to process his travel voucher.

The plaintiff has failed to establish a prima facie case of discrimination for this allegation.  The plaintiff's lack of access to computer files does not constitute an adverse employment action because it did not alter the terms of his employment.  See Storey, 390 F.3d at 764.  The defendant processed the plaintiff's travel voucher, and the plaintiff received his reimbursement.  Further, the plaintiff does not allege that the defendant treated a similarly situated non-African American employee differently.  See Kosereis, 331 F.3d at

214.[15]

    7.   The Plaintiff's Termination

        The plaintiff alleges that he was terminated as a
result of race discrimination.  The defendant argues that the
plaintiff's termination was due to the plaintiff's inability to
fly and, thus, to perform the essential functions of his position
as a FAM.  The plaintiff counters that he could perform the
essential functions of his position because not all FAM employees
are required to fly.  He points to a policy directive regarding
ground-based FAMs.  The plaintiff further argues that the
defendant is required to offer a reasonable accommodation, given
the plaintiff's illness, but that he was not properly provided
such accommodation through a light duty position.  Ex. A to Pl.'s
M, filed under seal; Pl's. Opp. 2-7.

        The plaintiff fails to establish a prima facie case of
discrimination for this claim.  First, the plaintiff must be
qualified for his position in order to satisfy his prima facie
burden, and the plaintiff was not qualified to be a FAM.  See
Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir.

_____

        [15] In his complaint, the plaintiff notes that, while he was
on AWOL status, he was not allowed to purchase Sig Sauer weapons
for his personal use.  Neither side mentions this allegation in
its brief.  Because the plaintiff does not provide evidence that
similarly situated employees who were on AWOL status could
purchase these weapons, the Court finds that the plaintiff has
not met his prima facie burden for this claim.  Compl. ¶ 56; See
Kosereis, 331 F.3d at 214.

2004).  The plaintiff stated that ninety percent of his job required him to fly.  It is undisputed that the plaintiff could not fly.  The defendant's policy at the time of the plaintiff's employment was that a FAM could be removed if he could not perform an essential function of his position.  The policy directive to which the plaintiff refers, if relevant, was implemented in 2007, after the plaintiff was terminated.  Second, the plaintiff has not pled a claim for disability discrimination, and so the allegation that he was denied a reasonable accommodation cannot withstand summary judgment.

B.   Retaliation

To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity, (2) his employer took an adverse action against him either after or contemporaneous with the protected activity, and (3) a causal link exists between the protected activity and the employer's adverse action.  Slagle v. County of Clarion, 435 F.3d 262, 265 (3d Cir. 2006).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action.  The burden then shifts back to the plaintiff to demonstrate pretext.  McDonnell Douglas, 411 U.S. at 804-05.

The Court grants summary judgment on the plaintiff's retaliation claim because the plaintiff does not establish that

his employer took an adverse action against him either after or contemporaneous with the protected activity and that a causal connection exists between his EEO complaints and the defendant's alleged adverse actions.

First, almost all of the defendant's alleged adverse actions precede February 4, 2005, the date that the defendant became aware of the plaintiff's EEO activity: (1) the defendant placed the plaintiff on AWOL status on November 30, 2004; (2) the plaintiff did not initially receive a formal light duty assignment on December 10, 2004; (3) the defendant's first recommended discharge occurred December 15, 2004; (4) the retrieval of the plaintiff's equipment and credentials occurred January 4, 2005; (5) the defendant locked the plaintiff out of the computer system on January, 4, 2005; and (6) the processing of the plaintiff's workers' compensation claims occurred in January 2005.

Second, the alleged adverse actions that occurred after the defendant learned of the plaintiff's protected activity lack a causal nexus. A plaintiff can demonstrate a causal connection between an employer's knowledge of protected activity and an adverse employment action by temporal proximity if the proximity is "very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Alternatively, a plaintiff can demonstrate a causal connection by showing circumstantial evidence of a pattern

of antagonism following the protected conduct.  <u>Kachmar v. Sungard Data Sys.</u>, 109 F.3d 173, 177 (3d Cir. 1997).

The plaintiff does not establish a causal connection based on temporal proximity because the defendant's alleged adverse actions occurred months after February 4, 2005: (1) the plaintiff's fourteen-day suspension occurred on June 8, 2005; (2) the plaintiff's travel voucher processing occurred December 29, 2005; and (3) the plaintiff's actual termination occurred January 23, 2006.  <u>See</u> <u>Breeden</u>, 532 U.S. at 273-74 (citing cases not finding temporal proximity when actions were months after protected activity).  In terms of circumstantial evidence, the plaintiff does not demonstrate a pattern of antagonism nor allege that any antagonism escalated after he filed his EEO complaints. <u>See</u> <u>Robinson v. SEPTA</u>, 982 F.3d 892, 895-96 (3d Cir. 1993) (finding pattern of antagonism due to barrage of warnings and disciplinary actions after plaintiff's initial complaints).

## III. <u>Conclusion</u>

The plaintiff has failed to demonstrate sufficient evidence to establish a prima facie case of discrimination or retaliation under the <u>McDonnell Douglas</u> burden-shifting analysis. The Court will grant the defendant's motion for summary judgment.

An appropriate order shall follow separately.